IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID KRAJEWSKI,  )  <br>  )  <br>Plaintiff,  )  <br>  )  <br>v.  )  <br>  )  <br>ENDERES TOOL COMPANY, INC.,  )  <br>a Minnesota corporation, and  )  <br>NORTHERN TOOL & EQUIPMENT  )  <br>CO., a Florida corporation,  )  <br>  )  <br>Defendants.  )  | 7:03CV5029  <br>  <br>  <br>  <br>**MEMORANDUM**  <br>**AND ORDER** |

This matter is before the court upon motions by Enderes Tool Company, Inc., ("Enderes") and Northern Tool and Equipment Co. ("Northern Tool") for summary judgment (filings 80 and 83, respectively). I will grant the motions and dismiss the complaint of David Krajewski ("Krajewski").

## I. BACKGROUND

Krajewski was injured while using a pry bar manufactured by Enderes and sold by Northern Tool. The complaint raises negligence, breach of warranty and strict liability claims.

Looking at the record in the light most favorable to the plaintiff, I find the material undisputed facts to be these.[1]

---

[1] Documents referenced in this summary of facts are scattered throughout the court file. Complete citations to those documents are set forth below. I hereafter refer to those documents by name only.
   Gall Dep., Ex. B to filing 79;
   Kotula Aff., part of filing 32 and incorporated by reference into filing 84;

1.    Krajewski has been a self-employed farmer since 1973 or 1974. (Krajewski Dep. at 15:16-22.)

2.    On September 18, 1999, Krajewski was in his fields repairing a combine. He was removing a sprocket and replacing a bearing on an auger drive. He used the pry bar in an attempt to remove the sprocket. (Krajewski Dep. at 26:24-27:3; 28:13-15.) There were alternative methods of removing the sprocket, including using different tools or having the combine dealer undertake the repairs. (Krajewski Dep. at 96:5-16.)

3.    Just before getting underneath the combine to make the repairs, Krajewski took off the tinted safety glasses he was wearing because the sun was starting to set and it was getting darker. (Krajewski Dep. at 26:9-23, 33:20.)

4.    Krajewski testified as follows regarding the removal of his safety glasses:

Q:    And what time of day was it?

A:    The sun was starting to set, so it was getting darker or, you know, it was evening or getting closer to evening. So does that put the time five-ish maybe or four-ish, you know, just enough so it's starting to get a little darker you know.

Q:    Was your ability to see what you were doing affected by the fact that it was getting darker?

---

Krajewski Dep., part of filing 32 and incorporated by reference into filing 84; Skaggs Aff., part of filing 32, and incorporated by reference into filing 84; and Skaggs Dep., Ex. A to filing 91.

> A: The only – how do I put this? I had taken my safety glasses off and sat them down because they're tinted safety glasses. And as you back up under – I'd used the vehicle to back up underneath the side panel of the combine so that's where it had become a little bit – that's why I took the safety glasses off. Contrary to popular belief I am a pretty safe person.

(Krajewski Dep. at 26:9-23.) He later clarified that he removed the tinted safety glasses to get better vision in poor light.

> Q. You testified that you had been using safety glasses but that you had removed them immediately prior to striking the pry bar?
>
> A. That's correct.
>
> Q. And what did you state your reason for doing that was?
>
> A. The lighting underneath the combine when I backed in wasn't the best, and my safety glasses that I had were tinted safety glasses. And I just wanted to be able to see what I was doing, and I flat took them off and sat them down.

(Krajewski Dep. at 106:1-11.)

    5. After removing his safety glasses, Krajewski stood on the tailgate of a pickup truck he had driven under the combine and struck the subject pry bar with a hammer in an attempt to remove the broken sprocket. (Krajewski Dep. at 31:13-32:2, 32:24-33:2, 33:21-23.)

    6. On the first strike of the hammer against the pry bar, the pry bar splintered. A piece of metal flew into Krajewski's eye, injuring him. (Krajewski Dep. at 38:7-10).

7.   The subject pry bar had never before been used.  Krajewski removed it from its packaging just before he used it in repairing the combine.  (Krajewski Dep. at 105:3-13.)

8.   The subject pry bar was one in a package of three purchased by Krajewski from Northern Tool on September 18, 1999.  (Koutula Aff. ¶ 2.)  The pry bars were made of high carbon steel.

9.   Krajewski bought the pry bar from Northern Tool.  Northern Tool did not manufacture the pry bar, but purchased it pre-packaged from its manufacturer, Enderes. (Koutula Aff. ¶¶ 3-5.)

10.   Krajewski's son drove him to the hospital after the injury, then returned to the farm and used the subject pry bar to finish repairing the combine.  (Krajewski Dep. 35:3-23; 68:19-21.)  The record does not reflect whether Krajewski's son wore safety glasses when he used the pry bar.

11.   Regarding warnings to use safety glasses, Krajewski testified as follows:

Q:   Are there any safety warnings on the back [of the package the subject pry bar came in]?

A:   Yes, there is.

Q:   And where is that safety warning?

A:   Something about you're always supposed to wear goggles.

Q:   Do you know if there was a safety warning on the pry bar itself?

> A: I couldn't rightly tell you if there was. I think there is a picture that says – or was that on the hammer? I mean, they staple those things on everything it seems like.
>
> Q: By "those things," what do you mean?
>
> A: On most tools wear safety glasses, safety glasses should be worn. That's not in contention.
>
> . . . [Krajewski testified that he had not taken any seminars in farm safety, but farm safety was addressed in seminars he attended on running feedlots.]
>
> Q: Was the subject of safety glasses directed towards that portion of the feedlot seminar?
>
> A: I don't remember.
>
> Q: Okay.
>
> A: The issue is not whether or not you should wear safety glasses or not. Safety glasses should be worn.

(Krajewski Dep. at 66:2-67:23.)

12. It had long been Krajewski's practice to wear safety goggles when working around farm equipment. He testified as follows:

> Q. Okay. All right. You said you were – you had safety goggles. Do you normally use safety goggles when you're working around farm equipment?
>
> A. I try to all the time. Now, that I've got glasses I don't put goggles over them until I get into a real serious situation.

> Q. How long have you used safety goggles would you say in your line of work as a farmer and rancher?
>
> A. I have – I'm trying to remember when we didn't either make sure we had, you know, sunglasses or safety glasses when we're working on something. I mean, I'm sorry, but that's the way it is. I'd like to say I've never read about it, but I have.

(Krajewski Dep. at 88:11-14.)

    13.    Krajewski was aware of the risk of injury from metal chips when using a metal hammer to strike a metal object. He acknowledges that safety googles would prevent injury from metal chips. This interchange from his deposition is illustrative.

> Q. Do you think it's a risk when you're hammering or tapping metal on metal that you'll have chips come from pieces of metal? Do you think that's a risk of using those types of tools?
>
> A. There is a risk in everything. I mean, I've heard of guys going and hitting chisels that, you know, go clear through them, you know, metal. That's – Is there a risk to driving a car, yes, I suppose there is, yes.
>
> Q. Well, you would agree with me then that there is a risk whenever you use a hammer on any piece of equipment or on any tool that there is a risk of something chipping off?
>
> A. Yes, there is a risk.
>
> Q. And, of course, that's why safety goggles are recommended; is that true?
>
> A. That is correct.

(Krajewski Dep. at 93:20-94:1.)

14.     The subject pry bar is stamped with a warning to use safety glasses. (Photograph, page 3 of Skaggs Aff.)  The hammer Krajewski used to strike the pry bar is also stamped with the same type of warning.  (Photograph, page 4 of Skaggs Aff.)  Krajewski may not have been aware that the particular hammer handle contained a safety warning to use goggles (Krajewski Dep. 94:24-95:1), but he knows that most tools come with a warning to wear safety glasses.  (Krajewski Dep. 66:12-16.)

15.     The packaging provided with the pry bar also states "WARNING: Always Wear Safety Goggles." (Photograph, Ex. G. to filing 91.)  The back of the package also contained a chart, in English, Spanish, and French, listing particular tools and their applications.  None of the listed tools was a pry bar.  The "applications" included "cutting, shaping, and removing metal softer than the cutting edge itself" and "starting holes in metal and wood."  The package also stated that "Enderes Tool Company has produced struck tools in the USA for over 80 years. Using a unique manufacturing process, these products are unsurpassed in strength and durability."  (Photograph, Ex. G. to filing 91.)

16.     Plaintiff's expert, Dr. Kenneth Gall, was able to replicate the chipping which occurred on the subject pry bar with only ten strikes applied by the same hammer Krajewski was using on the day of the accident. (Gall Dep. 15:21-16:23; 18:9-13; 40:20-41:18.)  Dr. Gall did not opine as to whether it was unusual for a pry bar to chip when used to pry a piece of metal.  (Gall Dep. 13:4-13.)

17.     Dr. Gall testified that rounding the sharp edges of the head of the subject pry bar would decrease the propensity for the pry bar to chip, and that the pry bar in question would be safer if it did not chip.  Dr. Gall had not tested pry bars from other manufacturers and had no knowledge whether pry bars from other manufacturers would chip.  (Gall Dep. 30:15-31:23.)

18.     Defense expert Joseph Skaggs was able to replicate similar chipping on a pry bar manufactured by a third party manufacturer, and cracking on yet another pry bar manufactured by a third party manufacturer, which Skaggs believed would ultimately lead to chipping.  (Skaggs Dep. 28:20-29:3; 36:19-37:4.)

19.     Dr. Gall conducted hardness testing on the pry bar using a common hardness test used in the industry, found the pry bar to be of "moderate hardness" and not brittle, and concluded the hardness of the pry bar did not present a problem as the results were within the range expected for tools used for prying and hammering.  (Gall Dep. 14:11-15:1.)  Northern Tool's expert Joseph Skaggs agreed with these conclusions.  (Skaggs Dep. 8:17-9:3.)

20.     Krajewski chose to purchase Enderes-manufactured pry bars because "they were American made and [he] anticipated them being a very strong tool."  (Krajewski Dep. 89:24-90:1.)  There was no evidence that Krajewski considered the language on the packaging when deciding to buy Enderes-manufactured pry bars.

## II.  DISCUSSION

I apply the well-known standard for granting summary judgment.  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

### A.  NEGLIGENCE CLAIM

Plaintiff alleges that Defendants were negligent in failing to adequately warn of the possibility that the pry bar could chip and splinter.  (Complaint ¶¶ 19-20; Filing 83, Pl.'s Br. in Resp. to Northern Tool's Mot. for Summ. J. at 3; Filing 90, Pl.'s Br. in Resp. to Enderes' Mot. for Summ. J. at 3.)  Assumption of the risk is an affirmative defense to negligence, and Defendants have established that Plaintiff assumed the risk

of eye injury from chipped or splintered metal when he removed his safety goggles. I will explain.

The Nebraska statute codifying the assumption of the risk defense states as follows:

> Assumption of the risk is an affirmative defense. Assumption of risk shall mean that (1) the person knew of and understood the specific danger, (2) the person voluntarily exposed himself or herself to the danger, and (3) the person's injury or death . . . occurred as a result of his or her exposure to the danger.

Neb. Rev. Stat. Ann. § 25-21,185.12 (LexisNexis 2004). This requires a "subjective standard, geared to the individual plaintiff and her or her actual comprehension and appreciation of the nature of the danger he or she confronts." Burke v. McKay, 679 N.W.2d 418, 424 (Neb. 2004).

The undisputed facts show that Krajewski knew that (1) there is a danger of chipping or splintering <u>whenever</u> one metal tool is struck with another, and (2) he should wear safety goggles when striking one metal tool with another to prevent eye injury from possible chips or splinters. (Krajewski Dep. at 66:2-67:23; 93:20-94:1.) Krajewski asserts that he was not aware of these risks until after his injury, but the facts belie this argument. The only reason to wear safety goggles is for eye protection, and there is evidence that it had long been Krajewski's practice to wear safety goggles when working around farm equipment. (Krajewski Dep. at 88:11-14.) He had removed his goggles just prior to his injury

When a injury results from the commonly known characteristics of a product, then knowledge of those common characteristics is sufficient to establish assumption of the risk (assuming the other elements are present). In such circumstances, knowledge of those common propensities is the awareness of "specific" harm

-9-

required by Neb. Rev. Stat. Ann. § 25-21,185.12. It is only when injury results from latent defects or unusual or atypical characteristics that knowledge of the latent defect or unusual or atypical characteristic is required to establish assumption of the risk. Burke, 679 N.W.2d at 424-25 (mere knowledge that rodeo bucking horses buck off riders cannot form basis of assumption of risk, but rodeo rider's knowledge that a particular bucking horse had once before bucked in unusual manner, resulting in horse falling over backwards and on top of rider, was sufficient to establish assumption of the risk); Jay v. Moog Automotive, Inc., 652 N.W.2d 872, 882-83 (Neb. 2002) (no assumption of risk when auto mechanic was injured by compressor lacking a retaining pin; although mechanic was aware of the specific risk of using the compressor without a pin, evidence did not show that mechanic voluntarily removed the pin, and pin might have simply fallen out of place); Pleiss v. Barnes, 619 N.W.2d 825, 829-30 (Neb. 2000) (when plaintiff was injured when ladder flipped, twisted, and slid–either because of its placement or because it was not tied down–knowledge that ladders are generally dangerous not enough to establish assumption of risk).

Krajewski asserts that the "specific danger" of which he must be aware is the danger that the pry bar would chip or splinter upon the first strike of a hammer against it. See, e.g., Filing 90, Pl.'s Br. in Resp. to Enderes' Mot. for Summ J. at 3 (noting that paragraphs 19 and 20 allege negligence "in failing to warn the Plaintiff of the possible hazards or dangers involved in the use of the subject pry bar, specifically the possibility of chipping and splintering"); Id. at 29 (asserting that Plaintiff "had no anticipation or contemplation that the subject pry bar would chip on the first strike of the Plaintiff's hammer"). He also asserts that the defendants cannot establish an assumption of the risk defense unless they acknowledge that the pry bar had a defect and that he was aware of that defect. Id. (quoting Rahmig v. Mosley Machinery Co., Inc., 412 N.W.2d 56, 74 (Neb. 1987) for the propositions that "the Plaintiff would have to know the subject pry bar was defective *before* he used it . . . . In fact, . . . for . . . Northern Tool to be successful on an assumption of the risk defense at this stage, it would, in essence, have to tacitly admit there was a defect in

-10-

the subject pry bar.") (emphasis in original). These arguments are based on a misreading of Rahmig.

Rahmig was a products liability case asserting that the manufacturer was strictly liable because the product had a latent design defect (a deficient hydraulic system caused the upper blade of a guillotine metal scrap shear to descend suddenly and unexpectedly). The defendant asserted that the plaintiff had assumed the risk of injury by climbing into the discharge chute of the scrap shear to clean out metal. The court found that the plaintiff had not assumed the risk, because there was no evidence that he "knew about the [scrap shear's] latent design defect . . . ." Id. at 450. In this context, the court observed that

> assumption of risk is a user's willingness or consent to use a product which the user actually knows is defective and appreciates the danger resulting from such defect. . . . A user's knowledge about the general danger or hazard in using a product will not support the defense that the user knew the product's specific defect and dangerous condition resulting from such defect.

Id. Rahmig does not limit assumption of the risk to a plaintiff's voluntary exposure to known risks of a latent defect.

Traylor v. Husqvarna Motor, 988 F.2d 729 (7th Cir. 1993) (Posner, J., applying Illinois law) is more on point. Mauls (metal tools used to split logs) were sold with warnings that one maul should not be struck against another, because chipping could occur and cause an eye injury, and that safety glasses should be worn when using a maul. Id. at 730. The plaintiff was splitting logs with a friend, and the plaintiff's maul got stuck in a log. The plaintiff was not wearing eye protection. The friend attempted to free the stuck maul head by striking it with his maul. When the friend's maul struck, it chipped, and the chip injured the plaintiff's eye. There was evidence that the friend knew that his own maul was chipped, cracked, and misshapen, but no

-11-

evidence that the plaintiff was aware that his friend's maul was defective. The court observed that "to assume the risk of an eye injury from a flying maul chip is not the same thing as assuming the risk of an eye injury caused by a chip from a *defective* maul. Id. at 732 (emphasis in original). In this situation, knowledge that "striking two mauls together can cause one of them to chip even if neither is defective" was insufficient to establish assumption of the risk. Id. at 732.

The case before me represents the situation not present in Traylor. Here, there is no evidence that the subject pry bar was defective. The metal was sufficiently hard. The fact that the pry bar chipped on this first use does not create a question of fact whether it was defective, as Krajewski asserts. During testing, pry bars from third party manufacturers chipped or splintered when struck with a metal hammer. Another Enderes-manufactured pry bar chipped on the 10th strike of a metal hammer during testing. These are indications that the subject pry bar behaved similarly to other pry bars. Krajewski was aware of the specific danger that striking two metal tools together can cause one of them to chip, such that he should wear safety goggles. When Krajewski removed those safety goggles, he assumed the risk of eye injury.

## B. WARRANTY CLAIMS

There is no express warranty unless the seller "make[s] an affirmation of fact or promise to the buyer which relates to the goods and becomes part of the basis of the bargain." Freeman v. Hoffman-La Roche, Inc., 618 N.W. 2d 827, 844 (Neb. 2000); Neb. Rev. Stat. Ann. UCC § 2-313 (LexisNexis2000). Krajewski asserts that statements on the pry bar package created an express warranty that the pry bar could be safely used as a struck tool. However, it is undisputed that Krajewski selected Enderes' pry bars because they were American made and he thought they would be strong. It is also undisputed that there was no problem with the hardness of the metal

used in the pry bar. Thus any alleged express warranty was not part of the basis of the bargain.[2]

When an implied warranty action cannot be distinguished from a strict liability action, a defense against strict liability operates as a defense to implied warranty claims, because those two theories of recovery express one basic public policy. Id. at 842-43.

## C. STRICT LIABILITY CLAIM

A strict liability claim may be based on a manufacturing defect (when the product differed from the manufacturer's plans and specifications) or on a design defect. Freeman, 618 N.W.2d at 833. Here, Krajewski asserts a design defect: inadequate warning of risk of metal chips or splinters that could cause eye injury.[3]

"Assumption of risk, under appropriate circumstances, may be an affirmative defense in an action brought for a manufacturer's strict liability in tort for a design defect." Rahmig, 412 N.W.2d at 74 (Neb. 1987). The appropriate circumstances are when defendant proves that the plaintiff knew of the claimed defect, understood the danger from it, and voluntarily and unreasonably exposed him or her self to that danger. NJI2d Civ. 11.26 (2004 Ed.). See also Hancock v. Paccar, 283 N.W.2d 25,

---

[2]I do not understand Krajewski to raise an implied warranty claim. If he had, the implied warranty claim would be indistinguishable from a strict liability claim. Freeman, 618 N.W.2d at 842-43. Assumption of the risk would operate as a defense to both claims.

[3]There is no evidence that the subject pry bar differed from Enderes' plans and specifications. This eliminates strict liability based on manufacturing defects. Although Dr. Gall testified that rounding the edges of the pry bar head would decrease the propensity for chipping, Dr. Gall was not asked to opine whether altering the head of the pry bar would affect its utility as a pry bar. (Gall Dep. 10:15-19; 59:6-18.)

38 (Neb. 1979) (burden of proving knowledge of defect is on defendant); Waegli v. Caterpillar Tractor Co., 251 N.W.2d 370, 373 (Neb. 1977) (no strict liability when plaintiff has knowledge of the claimed defect). For the same reasons that assumption of the risk negates Krajewski's negligence claim, it is a defense to the strict liability claim..

### III. CONCLUSION

For the reasons set forth above, I find that the defendants have established that there is no question of material fact, and summary judgment must be entered in favor of the defendants.

IT IS ORDERED:

1. The motion of Enderes Tool Company, Inc. for summary judgment (filing 80) is granted;

2. The motion of Defendant Northern Tool and Equipment Co. for summary judgment (filing 83) is granted; and

3. Judgment shall be entered by separate order in favor of Enderes and Northern Tool .

October 13, 2005.                    BY THE COURT:

                                     *s/Richard G. Kopf*
                                     United States District Judge